**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOSE VASQUEZ ISQUIERDO,
Plaintiff-Appellant,

v.

WILLIAM JOSEPH FREDERICK, in his
individual capacity; GREGORY
MARSHALL COX, in his individual

capacity,
Defendants-Appellees,

No. 96-1713

v.

CITY OF SANFORD, NC; SANFORD
POLICE DEPARTMENT,
Parties in Interest.

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Paul Trevor Sharp, Magistrate Judge.
(CA-94-689-1)

Submitted: July 15, 1997

Decided: August 5, 1997

Before HAMILTON and MOTZ, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

William W. Plyler, MCMILLAN, SMITH & PLYLER, Katherine E.
Jean, Raleigh, North Carolina, for Appellant. Tyrus V. Dahl, Jr.,

Ursula M. Henninger, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Jose Vasquez Isquierdo appeals the entry of summary judgment against him on federal and state claims arising from an incident in which he was shot by police. The magistrate judge ruled that Officers William Frederick and Gregory Cox are entitled to qualified immunity protecting them from suit. We affirm.

I

Isquierdo lived in Sanford, North Carolina, with Linda Polito and her four children. Isquierdo is the father of the two younger children, Megan, 3, and Jose, 2. On November 26, 1993, Thanksgiving Day, Isquierdo arrived home about 11 p.m. with two friends. The two older children were not home. Isquierdo and his friends drank beer and listened to music. Polito and the two children were in bed together. Around midnight, Isquierdo woke the children and brought them out to show his friends. The children were crying, and he sent them back to bed.

Isquierdo's friends soon left. Shortly after midnight, Isquierdo took a .32 caliber pistol, went outside, and began shooting into the air. He reloaded, went back outside, and shot again. He then fired shots inside the apartment. Isquierdo entered the bedroom where Polito and the children were, and fired into the ceiling. According to Isquierdo's deposition, he got to his knees beside the bed, apologizing in Spanish and telling the three he loved them. He rose from his knees and was walking toward the door to put the gun away when he was shot

2

through the window by police. His blood alcohol level, measured at the hospital, was .328.

The police version of events varies somewhat from that of Isquierdo and Polito. At around midnight, Officers Frederick and Cox heard gunfire, and the Sanford Police Department dispatched them and other officers to investigate. They heard more shots while on their way to Isquierdo's, and heard shots coming from inside the house when they arrived. Officers Cox and Frederick approached a lighted bedroom window. The curtains were drawn, but there was a three-inch, triangular opening at the bottom. The officers saw Isquierdo through the opening with an automatic weapon in his hand. Polito and the children were lying on the bed, and the children were crying. According to Frederick and Cox, Isquierdo was speaking in a loud, threatening manner in Spanish, which the officers did not understand, and in English. He had the gun in his hand, near a child's head. Frederick reported to Officer Cox and the dispatcher that this was a possible hostage situation. Officer Frederick was convinced that Isquierdo would shoot Polito and the children. The officers did not know that Isquierdo lived in that apartment with Polito, that the children were Isquierdo's, or that Isquierdo was drunk.

Officers Frederick and Cox crouched beneath the bedroom window, and were talking of ways to deal with the situation, when they heard three more shots. Cox stood and saw Isquierdo standing at the foot of the bed holding his gun. He sighted and fired twice. Frederick stated that he also fired once. Isquierdo denies that Frederick fired; no spent shell casing was found for his weapon. Isquierdo was shot in the back. He is paralyzed from just below the knees down, and can walk only short distances using leg braces. He is impotent and cannot control bowel and bladder functions. Isquierdo suffers severe back pain, which disturbs his sleep.

The magistrate judge ruled that, although there were certain factual disputes between the parties, they were not genuine, material issues that would preclude the entry of summary judgment. He held that a reasonable officer faced with the situation in question could perceive a life or death circumstance, in which the use of deadly force was necessary to prevent loss of life. Therefore, he granted the officers' sum-

3

mary judgment motion based on qualified immunity and dismissed the state law claims. Isquierdo appeals.

II

We analyze a claim that law enforcement personnel used excessive force in making an arrest de novo, under the Fourth Amendment reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). A district court first must determine whether defendants' conduct violated the plaintiff's constitutional rights, resolving what happened and whether that conduct was unconstitutional. Pittman v. Nelms, 87 F.3d 116, 119 (4th Cir. 1996). If the defendant's acts did violate the plaintiff's constitutional rights, then the court must determine whether defendant is entitled to qualified immunity from suit. The immunity question depends on whether the relevant law was clearly established at the time and whether a reasonable person in defendant's place should have known the conduct was illegal. Id.

At the summary judgment stage of an excessive force claim in which qualified immunity is asserted, the district court can combine these steps and resolve whether plaintiff has alleged the violation of a clearly established constitutional right. Pittman v. Nelms, 87 F.3d 116, 119 (4th Cir. 1996). If the answer is a positive one, then the court must decide whether the officers knew or should have known their actions were illegal. Pittman, 87 F.3d at 119. If so, the defendants are not entitled to immunity.

Force is not excessive if it is objectively reasonable under the circumstances, without regard to the underlying intent of the officers. Graham, 490 U.S. at 397. Objective reasonableness is judged from the point of view of a reasonable officer on the scene. Id. at 396. An officer may use deadly force when he or she has good reason to believe the suspect presents a threat of serious physical harm to the officer or others. Tennessee v. Garner, 471 U.S. 1, 11 (1985). Under Graham, the court must focus on the moment force was used, so that actions prior to that moment are irrelevant in evaluating whether the officer used reasonable force. Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996), cert. denied, ___ U.S. ___, 65 U.S.L.W. 3742 (U.S. June 27, 1997) (No. 96-1714).

4

In this case, Isquierdo asserts that issues of fact exist that preclude the entry of summary judgment. He claims that his evidence would show that he did not threaten to kill Polito and the children. He also asserts that the officers could see clearly into the bedroom, so Officer Cox could see that Isquierdo's back was toward the bed, and he was leaving the room. In addition, Isquierdo and Polito would testify that he was not yelling at Polito and the children. Therefore, he asserts, he was not posing a threat of deadly force at the time he was shot and his shooting was unreasonable under the Fourth Amendment. Isquierdo alleges that these facts must be resolved by a jury, citing Kane v. Hargis, 987 F.2d 1005 (4th Cir. 1993), and Rainey v. Connerly, 973 F.2d 321 (4th Cir. 1992). But unlike Kane and Rainey, here the key issue is not how much force was used, but whether the officers could reasonably perceive that Isquierdo posed a threat of serious harm.

Isquierdo also argues that the decision to "take him out" was made in advance by Officer Frederick, the ranking officer on the scene, rather than by Officer Cox, who did all the shooting in Isquierdo's factual scenario. Thus, he argues that the decision to shoot was not a split-second judgment, made in tense, rapidly evolving circumstances, but a cool-headed decision. But according to the depositions and statements of the officers, each made an independent decision to shoot Isquierdo because of his threatening conduct and use of deadly force in the presence of a woman and two small children. Both officers believed that if they did not react Isquierdo would have shot one or more of the others. Isquierdo presented nothing to contradict their statements. As the magistrate judge stated, even if Isquierdo was walking toward the door and Cox saw him do so, there was no way to tell whether he was pacing, going to reload the weapon, or about to turn toward the bed and shoot.

We hold that the officers were entitled to summary judgment based on qualified immunity. A reviewing court must not judge the officers' conduct with "the 20-20 vision of hindsight." Graham, 490 U.S. at 396-97. Here, a reasonable officer on the scene could perceive Isquierdo as a threat of serious harm to the other occupants of the bedroom. Therefore, we affirm the entry of judgment on the § 1983 claims.

5

III

Isquierdo's state law claims also fail. Law enforcement officers may not be held liable for acting within the scope of their authority unless their actions were corrupt or malicious. <u>Smith v. North Carolina</u>, 222 S.E.2d 412, 430 (N.C. 1976). Under N.C. Gen. Stat. § 15A-401(d)(2) (Supp. 1996), an officer can use deadly force in an arrest to defend himself or another from what he reasonably believes is the imminent use of deadly force. Thus, judgment was properly granted on the state claims, as well.

We affirm the judgment in favor of Officers Frederick and Cox. We deny appellant's motion for oral argument. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>AFFIRMED</u>

6